**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                              )
                              )
UNITED STATES OF AMERICA      )
                              )
        v.                    )     Criminal No. 14-CR-0018 (KBJ)
                              )
MARSHA RICHARDSON,            )
                              )
        Defendant.            )
                              )
_____)
```

## **MEMORANDUM OPINION**

Defendant Marsha Richardson is charged in an indictment with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Indictment, ECF No. 3.) Pending before the Court is Richardson's motion to suppress statements that she allegedly made to police on January 24, 2014, during the execution of a search warrant at her residence. (Mot. to Suppress Stmt. & Mem. in Supp. Thereof ("Def.'s Mot."), ECF No. 8; *see* Stmt. of Facts, Ex. 1 to Compl., ECF No. 1-1.) Richardson contends that her statements admitting to gun possession must be suppressed because they were obtained in violation of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), which requires suppression of statements that are the product of "custodial interrogation" in the absence of *Miranda* warnings. (Def.'s Mot. at 2.) The Court held an evidentiary hearing on March 27 and 28, 2014, and heard testimony from two police officers who executed the search warrant and heard the statements at issue. As explained below, this Court concludes that, although Richardson was being held in custody during the search, the incriminating statements that Richardson made were not the product of police interrogation. Consequently, her

1

motion to suppress those statements must be **DENIED**. A separate order consistent with this opinion will follow.

## I.    FACTUAL FINDINGS

The following facts were established at the suppression hearing. For the purposes of this suppression motion and except as otherwise noted, the basic facts preceding Richardson's challenged statements are not in dispute.[1]

On January 24, 2014, at about 6:00 A.M., a team of approximately 14 law enforcement officers who were employees of the Federal Bureau of Investigation ("FBI") and the District of Columbia Metropolitan Police Department ("MPD") executed a search warrant at an apartment in the Southeast quadrant of D.C. (Preliminary Transcript of March 27, 2014, Suppression Hearing ("Hr'g Tr. I") at 9, 35.)[2] FBI Special Agent Christopher Ray ("Agent Ray") led the law enforcement team that day, and Agent Ray was among the five or six officers who first approached the door to the apartment. (*Id.* at 31-32.) Agent Ray knocked on the apartment door and announced the police presence twice. (*Id.* at 11.) Hearing no response, the officers forced entry into the apartment using a battering ram to take down the door. (*Id.* at 32-33.)

When the police forcibly entered, it was dark inside the apartment, and the home was lit only with lights mounted to the officers' weapons, which were drawn for the officers' safety. (*Id.* at 11, 13, 33.) Upon entering the house with their weapons

---

[1] To the extent that there is disagreement between the parties regarding whether Richardson's challenged statements were unsolicited, the Court has concluded that the facts are as recited in this opinion. These facts have been established by a preponderance of the evidence, based on the testimony presented at the hearing and the evidence in the record with respect to this matter.

[2] The parties have not requested a formal transcript from the court reporter. Accordingly, the Court's citations to the transcript are from the court reporter's preliminary draft of the proceedings.

2

visible, the officers loudly identified themselves as police and ordered the inhabitants of the apartment to "come out" with their "hands in the air." (*Id.* at 12.) In compliance with the officers' commands, Richardson and another individual, William Hill, came out of a back bedroom with their hands up, and proceeded toward the officers, coming down a hallway from the master bedroom into the living room. (*Id.* at 12-13, 33.) Officers pointed their guns at Richardson and Hill (*id.* at 13, 33) until both individuals had been handcuffed with their hands behind their backs and searched for weapons. (*Id.* at 14-15.) At that point, the officers holstered their weapons, turned on the lights in the apartment, and directed Richardson and Hill to the living room, where they were placed sitting on a couch and a chair within five feet of one another. (*Id.* at 15.) While seated, Richardson and Hill were still handcuffed behind their backs and had a clear view of each other. (*Id.* at 15, 48-49.) The officers then began to search the apartment. (*Id.* at 16.)

It is undisputed that the search warrant had been issued to target Hill, who the Government believed was part of a larger drug conspiracy. (*See id.* at 9, 17.) The search warrant authorized the officers to search the apartment where Hill was known to be staying and to seize drugs and guns. (*See id.* at 17.) After entering the apartment and securing Richardson and Hill, the officers commenced their search for those items. (*See id.* at 16.) By that point, most of the 14 officers were in the apartment, and at least one officer remained in the living room with Richardson and Hill at all times. (*Id.* at 34-35.)

Five to ten minutes after securing Richardson and Hill, and while other officers continued the search, Agent Ray returned to the living room to speak with Hill. (*Id.* at

17-18, 35.) Agent Ray faced Hill directly, and he notified Hill that the basis of the search warrant was Hill's relationship with another individual who was the subject of an ongoing drug investigation, and in particular, Hill's history of drug transactions with that individual. (*Id.* at 17-18.) Hill admitted to knowing the person Agent Ray mentioned, but denied that his "business" with that person should have any bearing on the search of the apartment. (*Id.* at 18.) During this conversation, there was no background noise in the living room, and Richardson remained seated on a chair a few feet away. (*Id.* at 18.) Agent Ray did not speak to Richardson at that time, nor did she say anything to him. (*Id.*)

Sometime after that conversation, approximately ten minutes into the search, MPD Detective Lavinia Quigley ("Detective Quigley") entered the apartment. (*Id.* at 47.) Detective Quigley was one of the officers who had remained outside when the door was breached and the warrant was initially executed. (*Id.* at 46, 60.) Although dressed in plain clothes, Detective Quigley was armed and wore a mask that covered her face, showing only her eyes, in order to protect her identity. (*Id.* at 46.)[3] When she was outside of the apartment, Detective Quigley's role was to activate the emergency lights on a police car and to provide "outside detainment" (*id.* at 45), which generally meant ensuring that none of the occupants of the apartment fled or no evidence was tossed out of the windows. (*Id.* at 61.) Detective Quigley testified that she was also present at the scene that day in order to assist generally with the search. (*Id.* at 45.)

It was approximately 10 minutes after the initial team of officers entered the apartment that Detective Quigley also went inside. (*Id.* at 47.) Detective Quigley

---

[3] Detective Quigley wore the mask for her own safety because she works as an undercover detective who engages in numerous undercover drug transactions. She wore the mask to make sure her cover was not blown. (Hr'g Tr. I at 72.)

4

approached Richardson and asked her to provide basic background information so that Detective Quigley could run a warrant check. (*Id.* at 50.)[4] Richardson calmly provided the requested information, and Detective Quigley left the apartment to run a check using the information Richardson provided. (*Id.* at 50.)

Approximately 20 minutes into the search, the searching officers found a black .38-caliber pistol wrapped in a pink washcloth in a black purse at the bottom of a laundry basket in the corner of the master bedroom. (*Id.* at 19-20.) The officers found men's clothing in the laundry basket on top of the purse, along with several other items that appeared to belong to Hill, including mail matter and other documentation. (*Id.*) Suspecting that the gun belonged to Hill (*id.* at 42), Agent Ray returned to the living room to speak with Hill once again. (*Id.* at 20.) Agent Ray told Hill that the officers had found the gun and questioned Hill about whether it belonged to him and why he had it. (*Id.*) When Hill answered that the gun was not his, Agent Ray responded that Hill was on parole for a felony and that possession of a gun could have serious consequences for him. (*Id.* at 21.) Hill repeated that the gun was not his and he did not know whose it was. (*Id.*) Just like the first conversation, while Agent Ray spoke to Hill, Richardson remained seated just a few feet away. (*Id.*) After speaking to Hill, Agent Ray resumed the search, without asking Richardson any questions about the gun or saying anything else to her. (*Id.* at 22.)

Richardson's First Statement

Shortly after the exchange between Agent Ray and Hill, Detective Quigley, who had been outside running the records check, returned to the apartment. (*See id.* at 50.)

---

[4] The requested information was Richardson's first and last name, date of birth, and social security number. (Hr'g Tr. I at 50.)

She learned that the searching officers had discovered a gun. (*See id.* at 66, 75.) Another officer also informed her that Richardson had asked to use the bathroom. (*Id.* at 51.) As one of the few female officers on the search team (*see id.* at 63), Detective Quigley removed Richardson's handcuffs and escorted her to the bathroom in the apartment. (*Id.* at 51, 64.) Although the bathroom had been part of the initial protective sweep, the searching officers had not yet thoroughly searched the bathroom for evidence (*id.* at 73-74; *see id.* at 41-42); therefore, once Richardson was inside the bathroom, Detective Quigley went in after her and closed the bathroom door behind them, standing guard inside the bathroom while Richardson used the facilities. (*Id.* at 51, 64.) Detective Quigley testified that she joined Richardson in the bathroom both for Richardson's safety and to make sure she did not destroy evidence. (*Id.* at 51, 73-74.) While inside the bathroom with Richardson, Detective Quigley (who was still masked) stood at an angle, with her side to Richardson, to give Richardson some privacy, but kept her within eyesight at all times. (*Id.* at 52, 65.)

At some point while Richardson was in the bathroom, Richardson calmly told Detective Quigley that the gun was hers. (*Id.* at 52, 65.)[5] The detective did not ask Richardson any questions or say anything to her about the gun or anything else prior to Richardson's making this statement. (*Id.* at 52; *see also id.* at 65-66.) Moreover, even after Richardson allegedly stated that the gun was hers, Detective Quigley did not ask Richardson any follow-up questions about the gun. (*Id.* at 75.) In response to

---

[5] Defense counsel challenged this testimony of Detective Quigley, called it "incredible" and arguing that the idea that Richardson simply volunteered that the gun was hers defied common sense. (Preliminary Transcript of March 28, 2014, Suppression Hearing ("Hr'g Tr. II") at 7.) For the reasons explained *infra*, the Court finds that Detective Quigley's testimony in this regard is credible, and accepts her recounting as a statement of fact for the purpose of ruling on the instant suppression motion.

6

Richardson's unsolicited incriminating statement, a startled Detective Quigley only blurted out, "huh?"; then, in keeping with her limited role with respect to this particular search, she ordered Richardson to stay in the bathroom; told an officer in the hallway to make sure Richardson did not leave; and went to tell Agent Ray what Richardson had said. (*Id.* at 22, 52-53, 75.)

Richardson's Second Statement

Detective Quigley and Agent Ray returned to the bathroom together. Detective Quigley stood inside, while Agent Ray stood just outside the open bathroom door. (*Id.* at 23-24, 54.) Neither officer had his gun drawn. (*Id.* at 26, 54.) There is some discrepancy regarding who initiated the conversation with Richardson when both officers arrived back at the bathroom: Agent Ray recalls that Richardson again volunteered the statement that the gun was hers (*id.* at 24-25); Detective Quigley, on the other hand, testified that Agent Ray first asked Richardson a question about the gun, although she could not recall the specific question (*id.* at 54-55). In any event, both officers testified that Richardson once again stated that the gun was hers, and that she said so with a calm demeanor and in a normal tone of voice. (*Id.* at 24, 55.)

After Richardson's statement to both officers, Detective Quigley asked Richardson a question to the effect of: "If the gun is really yours, can you describe it?" (*See id.* at 55.) Richardson told the officers that the gun was in a black purse wrapped in a pink towel—an accurate description of the gun the officers had just found. (*See id.* at 25, 55.) The officers then urged her not to take ownership of the gun just to help Hill (*id.* at 26), but Richardson again stated that the gun was hers and that she had the gun for her own protection because she lived in a dangerous neighborhood. (*Id.* at 26, 37,

7

56.) Throughout this two-to-three-minute conversation, the officers spoke calmly and did not raise their voices, nor did Richardson, whose facial expressions remained normal. (*Id.* at 26-27, 55-57.)

Richardson's Third Statement

After the exchange in the bathroom, Agent Ray resumed the search of the apartment. (*Id.* at 27.) Detective Quigley escorted Richardson back to the living room, where she sat Richardson down without handcuffs or restraints of any kind. (*Id.* at 43, 57.) Approximately 15 minutes later—after a continued search did not reveal any other evidence that specifically linked Hill to the gun (*see id.* at 27)—the police decided that Richardson was going to be arrested for possessing the firearm (*id.* at 27-28, 58). Richardson was not dressed in clothing appropriate to leave the house on a winter's day, so Detective Quigley gathered clothing from the bedroom and escorted Richardson back to the bathroom to change. (*Id.* at 58, 60, 72-73.) As before, the bathroom door was closed and Richardson was not handcuffed. (*Id.* at 59) Inside the bathroom, Detective Quigley said to Richardson something to the effect of, "I hope you're not just taking a beef for a man." (*Id.* at 58.) Richardson responded by repeating that the gun was hers. (*Id.*) The two left the bathroom (*id.* at 69-70), and a few minutes later an officer formally arrested Richardson, including providing the required warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). (*Id.* at 28-29.)

\* \* \*

Richardson now seeks to suppress the inculpatory statements that she made during the search of her apartment on the ground that they were obtained in violation of

8

her rights under *Miranda*.[6] The Government responds that the police were not required to provide *Miranda* warnings at the time she made those statements because the prerequisite for such warnings—custodial interrogation—was entirely absent. Thus, the issue before this Court is whether Richardson was in custody and subjected to interrogation when she made the challenged statements.

## II. LEGAL STANDARD

Under *Miranda*, if a suspect makes a statement while he is being subjected to custodial interrogation, law enforcement officers must have previously provided certain warnings or else the statements are not admissible in any subsequent prosecution. *Miranda*, 384 U.S. at 444.[7] The *Miranda* rule safeguards the Fifth Amendment privilege against self-incrimination, and significantly, law enforcement officers are required to administer the warnings only when a suspect is "in custody" and makes a statement in response to "interrogation." *See id.* The defendant bears the burden of proving both custody and interrogation by a preponderance of the evidence. *United States v. Peterson*, 506 F. Supp. 2d 21, 23 (D.D.C. 2007) (citation omitted); *see also United States v. Pena*, 961 F.2d 333, 338 (2d Cir. 1992).

To determine whether a defendant is "custody" for the purposes of *Miranda*, the court is required to employ an objective standard that focuses on whether "a reasonable person" in the suspect's position would "have felt he or she was not at liberty to

---

[6] Richardson only challenges the three sets of statements she made in the bathroom pertaining to the gun, not the identification information that she gave to Detective Quigley in their first encounter in the living room. (*See* Def.'s Mot. at 1; Hr'g Tr. II at 6.)

[7] Specifically, the police must advise a suspect of (1) the right to remain silent; (2) the consequences of waiving that right—specifically, that any statements can and will be used against him in court; (3) the right to consult with a lawyer and to have a lawyer present during interrogation; and (4) the right to have an attorney appointed if the person is indigent. *Miranda*, 384 U.S. at 444.

9

terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam); *United States v. Savoy*, 889 F. Supp. 2d 78, 108 (D.D.C. 2012); *Peterson*, 506 F. Supp. 2d at 23; *United States v. Calloway*, 298 F. Supp. 2d 39, 47-48 (D.D.C. 2003). The suspect need not have been formally placed under arrest, and when determining whether a suspect is in "custody" within the meaning of *Miranda*, courts have considered circumstances including the location and length of the encounter, the number of officers and citizens present, whether the police entered the location by force, whether the officers' weapons were visible or drawn, whether officers were present throughout the encounter, whether the suspect was handcuffed, and the tone and demeanor of the officers and the suspect. *See, e.g.*, *Savoy*, 889 F. Supp. 2d at 109-10; *Peterson*, 506 F. Supp. 2d at 24; *United States v. Suchit*, 480 F. Supp. 2d 39, 53 (D.D.C. 2007). The "not free to leave" standard takes into account the totality of the circumstances, and no one fact or circumstance is dispositive. *See Stansbury*, 511 U.S. at 321, 325; *Peterson*, 506 F. Supp. 2d at 24. The question is whether the factors, taken together, create a "police-dominated" atmosphere. *See Savoy*, 889 F. Supp. 2d at 108 (citing *United States v. Craighead*, 539 F.3d 1073, 1083-84 (9th Cir. 2008)).

Notably, although law enforcement detention of occupants and potential suspects during the course of executing a search warrant is lawful under the Fourth Amendment, *see United States v. Brinson-Scott*, 714 F.3d 616, 621 (D.C. Cir. 2013) (citations omitted); *see also Muehler v. Mena*, 544 U.S. 93, 98 (2005), such detention can take place under circumstances that constitute "custody" for *Miranda* purposes. *See Brinson-Scott*, 714 F.3d at 621; *see, e.g.*, *Peterson*, 506 F. Supp. 2d at 23. Indeed,

custody "need not include detention in a police facility and may even be found to exist in one's own home or bedroom[,]" if the conduct of the law enforcement officers "turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated'" environment. *See Savoy*, 889 F. Supp. 2d at 108 (citing *Orozco v. Texas*, 394 U.S. 324, 326-27 (1969); *Craighead*, 539 F.3d at 1083-84).

"Interrogation" refers both to express questioning by the police and to "any words or actions on the part of the police" that "the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *United States v. Sheffield*, 821 F. Supp. 2d 351, 3556 (D.D.C. 2011) (citation omitted). Importantly, questions that the police put to a suspect do not always constitute interrogation within the meaning of the *Miranda* doctrine. Rather, the key is whether the officer's questions are "reasonably likely to elicit an incriminating response," and in making that determination "the court looks at the 'totality of the circumstances' and conducts 'an objective inquiry[,]' where 'the subjective intent of the officer is relevant but not dispositive.'" *Sheffield*, 821 F. Supp. 2d at 356 (quoting *United States v. Bogle*, 114 F.3d 1271, 1275 (D.C. Cir. 1997)). Moreover, the "interrogation" inquiry "focuses primarily on the perceptions of the suspect, rather than the intent of the police." *United States v. Chase*, 179 F. App'x 57, 58 (D.C. Cir. 2006) (quoting *Innis*, 446 U.S. at 301-02). In other words, "[e]ven if the police conducting the questioning did not intend to elicit incriminating statements, the Court must focus upon what the defendant subjectively believed concerning his situation when considering whether the type of questioning was 'reasonably likely' to elicit an incriminating statement." *Sheffield*, 821 F. Supp. 2d at 356 (citing *Innis*, 446 U.S. at

11

302). It is also important to note that "[*v*]olunteered statements of any kind are not barred by the Fifth Amendment[,]" *Bosley v. United States*, 426 F.2d 1257, 1260 (D.C. Cir. 1970) (emphasis added); therefore, "[a]ny statement given freely and voluntarily without any compelling influences" is admissible regardless of whether *Miranda* warnings were given. *Id.* (concluding that defendant's statement—which was made immediately after the police entered his home, shook him awake, and informed him that a neighbor had said that the defendant raped her—was admissible because it was a spontaneous statement in which there "was no opportunity for the police to employ any abusive practice in order to obtain an incriminating statement" (citation omitted)); *see also United States v. Samuels*, 938 F.2d 210, 214 (D.C. Cir. 1991) ("[S]pontaneous statements are admissible without *Miranda* warnings." (citation omitted)); *Sheffield*, 821 F. Supp. 2d at 356 (same).

At bottom, "[i]n deciding whether particular police conduct is [custodial] interrogation, [the court] must remember the purpose behind" the Supreme Court's decision in *Miranda*: "preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro*, 481 U.S. 520, 529-30 (1987).

### III. ANALYSIS

As noted above, *Miranda* only precludes the admission of unwarned statements that are made when a suspect is both "in custody" and subjected to police interrogation. Richardson maintains that she was in custody for the purposes of *Miranda* when she made the three sets of statements at issue here, and she argues that the incriminating statements must have been the product of interrogation because it is not reasonable to

believe that she would have volunteered them. (Preliminary Transcript of March 28, 2014, Suppression Hearing ("Hr'g Tr. II") at 5-6 (arguing that Richardson was in custody); *id.* at 8 (arguing that there was interrogation).) This Court agrees that Richardson was in custody under the circumstances presented here, but also believes that Richardson voluntarily stated—and restated—that the gun was hers, without any compulsion whatsoever (and indeed, the evidence establishes that any reasonable suspect would have believed that the officers were attempting to *exculpate* Richardson rather than forcing her to make incriminating statements). Consequently, as explained below, the duty to administer *Miranda* warnings did not arise prior to the challenged statements.

**A. Custody**

The Government has conceded that Richardson was in custody at the time she made the second and third incriminating statements. (Hr'g Tr. II at 4, 23, 26.) Therefore, in deciding the custody question, this Court must only consider the totality of the circumstances preceding Richardson's initial statement in order to determine whether a reasonable person would have believed that she was free to leave.

On the instant record, the fact that Richardson was in custody prior to making the first statement is abundantly clear. A number of armed officers had forcibly entered Richardson's apartment in the early morning hours with weapons showing, handcuffed her behind her back, and placed her in the living room while they executed the search warrant. *Cf. Savoy*, 889 F. Supp. 2d at 109-10; *Peterson*, 506 F. Supp. 2d at 24. Richardson clearly believed she was not free to move about her apartment—let alone to leave altogether—given that she reportedly requested permission to move from the

13

living room to the bathroom. And Richardson's apparent conclusion that she was under the control of the police officers during the course of the search was entirely reasonable in light of the fact that at least one officer was in the living room with her and Hill during the entire search, and that even when she was permitted to go to the restroom, she was escorted to the facilities by an officer who remained with her inside the closed bathroom at all times. However calm in demeanor and normal in tone, the officers were *ever present*, and while they did not state that Richardson was under arrest when the search commenced, they also did not explain that she was free to leave at any time during the course of the search. (*See* Hr'g Tr. I at 42.) Under these circumstances, the Court concludes that Richardson was in custody because a reasonable person would not have felt free to leave the apartment.

Courts in this district have concluded that a defendant was "in custody" for the purposes of *Miranda* in analogous situations. *See Savoy*, 889 F. Supp. 2d at 109-10; *Peterson*, 506 F. Supp. 2d at 24.[8] For example, in *United States v. Peterson*, the court found the defendant was in custody when officers detained him during the execution of a search warrant. 506 F. Supp. 2d at 24. In *Peterson*, officers forcibly entered the defendant's home with their weapons drawn, handcuffed the defendant, and sat him in the living room. *Id.* In concluding that the defendant was in custody, the court noted that "forced entry was necessary, several officers were present on the scene, and unholstered weapons were clearly visible[,]" which, in the court's view, contributed to

---

[8] The only case that the Court has located that suggests a different outcome is *United States v. Calloway*, 298 F. Supp. 2d 39 (D.D.C. 2003). In *Calloway*, the court rejected the argument that the defendant was in custody for the purposes of *Miranda*, where officers had forcibly entered his home, kicked in the door to his room, momentarily brandished their weapons, and then placed the defendant in temporary plastic handcuffs for ten minutes. 298 F. Supp. 2d at 49. But the court in *Calloway* denied the defendant's motion to suppress, and also found that there was no custody, based on reasoning that focused more on the absence of interrogation, particularly the content of the officers' questioning, rather than on the custody issue. *See* 298 F. Supp. 2d at 49.

14

the creation of a custodial situation, especially in light of the fact that the defendant had been arrested on a related offense several days earlier. *Id.* The *Peterson* court also noted that, like Richardson here, the defendant was placed in handcuffs during the course of the search. *Id.*; *but see Calloway*, 298 F. Supp. 2d at 49.[9]

Similarly, in *United States v. Savoy*, 16 agents forcibly entered the defendant's home at 6:00 am, officers handcuffed the defendant and his family members and instructed them to be seated in the living room, and an officer accompanied the defendant to the restroom. 889 F. Supp. 2d at 109-10. Notably, unlike the instant case, the officers in *Savoy* never drew their weapons or pointed them at the defendant, and the questioning occurred even before the officers began their search, so the defendant was subject to a much shorter detention than Richardson. *Id.* Still, given the officer's forcible entry and the handcuffs, the court found the defendant was "in custody" when officers detained him after entering his home to execute a search warrant. 889 F. Supp. 2d at 110.

---

[9] The D.C. Circuit has thus far declined to reach the question of whether a defendant is in "custody" for the purposes of *Miranda* when she is handcuffed during the execution of a search warrant. *See, e.g., United States v. Brinson-Scott*, 714 F.3d 616, 621 (D.C. Cir. 2013); *United States v. Harris*, 515 F.3d 1307, 1311 (D.C. Cir. 2008); *United States v. Gaston*, 357 F.3d 77, 82 (D.C. Cir. 2004). Other Circuits are split on whether handcuffing during the course of a search generally renders a defendant in "custody" for the purposes of *Miranda*. *Compare United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (handcuffing a suspect does not necessarily elevate detention to custody within the meaning of *Miranda*), *and United States v. Bautista*, 684 F.2d 1286, 92 (9th Cir. 1982) (defendant placed in handcuffs during detention was not in custody within the meaning of *Miranda*), *with United States v. Cowan*, 674 F.3d 947, 957-58 (8th Cir. 2012) (defendant placed in handcuffs and detained during execution of a search warrant is in custody where handcuffed), *cert. denied*, 133 S. Ct. 379 (2012), *and United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("[A] reasonable person finding himself placed in handcuffs by the police would ordinarily conclude . . . that he was restrained to a degree normally associated with formal arrest and, therefore, in custody."). It is clear, however, that the use of handcuffs is a relevant factor in a court's determination of the "custody" question. *See Brinson-Scott*, 714 F.3d at 621 (collecting cases); *see also Peterson*, 506 F. Supp. 2d at 23 (noting that handcuffs during execution of a search warrant does not *per se* amount to custody, but use of handcuffs is a significant factor).

The Government's arguments regarding Richardson's custodial status (*i.e.*, that she was not in custody prior to making her initial statement) are not persuasive. The Government contends that Richardson was in her own home, where she was more likely to feel comfortable, and there is no evidence on the record that the atmosphere in the home was at all "intimidating" or "coercive[.]" (Hr'g Tr. II at 12, 17.) The Government makes much of the fact that Richardson must have overheard Agent Ray's conversation with Hill about the purpose of the investigation and Hill's connection to the gun, so a reasonable person in Richardson's position would have recognized that she was not the target of the officers' investigation and, therefore, would have felt free to leave. (*Id.* at 12-13.) From the Government's perspective, it is also important that Detective Quigley removed Richardson's handcuffs when she escorted her to the bathroom (*id.* at 10) and that Richardson remained unhandcuffed until she was formally arrested after making all three statements. (*Id.* at 57.) And the Government also points to the demeanor of Agent Ray, Detective Quigley, and Richardson herself, emphasizing that neither officer raised his or her voice to Richardson, who herself remained calm throughout the encounter. (*Id.* at 15, 24.)

This Court finds that the Government's argument undervalues the details of the officers' entry into the home and places too much emphasis on what the police understood to be the purpose of the investigation, instead of how a reasonable person would view the situation. Looking at the totality of the circumstances, a reasonable person in Richardson's position would have been startled and felt restricted when armed officers forcibly entered in the dark, early-morning hours, and not only were the officers armed, but they had their weapons drawn, aimed directly at Richardson and Hill

16

as they walked with their hands in the air from the bedroom to the living room. The police immediately handcuffed both individuals and sat them in the living room, where an officer was always present. Richardson remained seated and handcuffed in the living for at least 20 minutes while the officers searched the apartment before she asked for permission leave the couch to use the bathroom. And although Richardson's handcuffs were taken off when she went to use the facilities, an armed, masked police officer escorted her there and stood inside the bathroom with an eye on Richardson at all times. This Court has no trouble concluding that, from an objective viewpoint, a reasonable person in Richardson's position would not feel free to leave the apartment. Therefore, Richardson was "in custody" for the purposes of *Miranda* when she first stated that the gun was hers.[10]

### B. Interrogation

Even though Richardson was "in custody," the incriminating statements she seeks to suppress are nonetheless admissible if, under the totality of the circumstances, she was not being subjected to police interrogation at the time she made the statements. This Court concludes that no such incrimination occurred here.

First of all, based on the officers' sworn testimony, it was made clear to Richardson that the focus of the officers' investigation was on Hill, not Richardson. However, Richardson was seated just a few feet away in an otherwise-quiet room when Agent Ray explained to Hill that the search warrant sought evidence of Hill's relationship with another individual who was the subject of an ongoing drug

---

[10] As noted above, the Government concedes that Richardson was in custody for the purposes of *Miranda* at the time she made the second and third set of statements (Hr'g Tr. II at 4, 23, 26); and indeed, Agent Ray specifically testified that Richardson was no longer free to leave the apartment after first admitting to gun possession. (Hr'g Tr. I at 38.)

17

investigation (Hr'g Tr. I at 17-18; *see also* Hr'g Tr. II at 11-12), and Richardson was also present when Agent Ray confronted Hill a second time about the gun and made clear that the police believed it belonged to Hill. (Hr'g Tr. I at 20-21.) Afterwards, in the privacy of the bathroom—and, importantly, separated from Hill—with a female officer who had not been involved in the initial forcible entry, Richardson could reasonably have decided to come clean and admit that the gun was hers. (*See* Hr'g Tr. I at 52-53, 65-66.) A reasonable person in Richardson's position might have volunteered the statement *precisely because* she was not the subject of the investigation, and the police were not talking to her, much less seeking to elicit from her any incriminating information. Moreover, there was nothing "inherently coercive" about the atmosphere in the bathroom when Richardson made the initial statement or when the two officers returned to the bathroom to discuss Richardson's statement further because, among other reasons, the officer's did not draw their weapons or raise their voices. Nor is it reasonable to believe that Agent Ray or Detective Quigley asked Richardson questions that were likely to elicit an incriminating response, when, based on the officers' testimony regarding what was said, any reasonable person in Richardson's position would have interpreted the officers' comments as providing Richardson with an opportunity to exculpate herself. In sum, the record does not establish that the officers' inquiries were reasonably likely to elicit incriminating responses; and indeed, the evidence supports the Government's contention that the opposite was true.

  Defendant's arguments to the contrary ring hollow. First, defense counsel contends that the Government's description defies logic—calling "incredible" Detective Quigley's testimony that Richardson simply volunteered the first statement while using

18

the facilities without any prompting from the officer. (Hr'g Tr. II at 7.) But common sense actually supports the Government's position. Detective Quigley's testimony provides a compelling and logical backdrop for her lack of questioning: due to her limited role in the investigation that day, it was not her place to question Richardson. The evidence bears out this characterization, insofar as Detective Quigley indisputably went to find Agent Quigley when Richardson started to talk to her, and, out of deference to the lead agent, Detective Quigley only asked follow-up questions regarding Richardson's admission when he was present. (Hr'g Tr. I at 53, 75.) It is also clear that the purpose of the one question Detective Quigley did ask—"if the gun is yours, then why don't you describe it?"—and the follow-up statement that Detective Quigley made to Richardson—"I hope that you're not taking a beef for a man"—was a transparent attempt to assist Richardson by prompting her to *recant* the admission that Richardson had voluntarily made, rather than an effort to coerce Richardson into admitting the crime. In light of Detective Quigley's limited role and her credible testimony regarding how she reacted to and treated Richardson during the search, it squares well with common sense that Detective Quigley did not prompt Richardson's first statement in any way.

Finally, and for what it's worth, the Court notes that there is no distinction between the first, second, and third statements that Richardson made from the standpoint of evaluating interrogation because, under the circumstances, the officers' actions and discussions with Richardson did not in any way evidence an intent to elicit incriminating statements from Richardson. Both officers testified that they thought Richardson had claimed the gun was hers only to help Hill, and both provided her with

19

several opportunities to withdraw her incriminating statement (*see* Hr'g Tr. I at 26, 55), which she then repeated twice more. An individual in Richardson's position, faced with Agent Ray's conversations with Hill in the living room and both officers' entreaties that Richardson not claim ownership of the gun only to help Hill, would have known that the officers were not eliciting incriminating statements from her. Instead, Richardson must have believed, as would any reasonable person in her position, that the officers were trying to help her, not hurt her. And under those circumstances, Richardson was not subject to interrogation. *See Innis*, 446 U.S. at 302; *Sheffield*, 821 F. Supp. 2d at 356.

## IV. CONCLUSION

Because the Court finds that Richardson's statements regarding possession of the gun were not made in response to police interrogation, they are admissible, despite the fact that Richardson was in custody at the time the statements were made. Accordingly, as set forth in the accompanying order, the motion to suppress is **DENIED**.

Date: April 14, 2014          *Ketanji Brown Jackson*
                              KETANJI BROWN JACKSON
                              United States District Judge